## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| WHITE STALLION ENERGY, LLC, *et al.*,[1] | ) | Case No. 20-13037 (LSS) |
| | ) | |
| | ) | (Joint Administration Requested) |
| Debtors. | ) | |
| | ) | |

### DECLARATION OF DAVID J. BECKMAN,
### CHIEF OPERATING OFFICER OF WHITE STALLION ENERGY, LLC,
### IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, David J. Beckman, hereby declare under penalty of perjury:

1.     I am the Chief Operating Officer ("COO") of White Stallion Energy, LLC ("WSE"), one of the above-captioned debtors and debtors in possession (collectively, the "Company" or the "Debtors"). I have served as a financial advisor to the Debtors and was appointed as WSE's COO on October 30, 2020. I am a Senior Managing Director at FTI Consulting, Inc. ("FTI"), a leading global business advisory firm with over 50 offices worldwide and over 4,000 professionals, where I am the practice leader of FTI's Global Mining Advisory Practice.

2.     I have worked as a turnaround consultant and financial advisor for over 30 years and have extensive experience in the mining industry, specifically with coal companies. I have substantial knowledge and experience in senior management positions with, or as restructuring

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  White Stallion Energy, LLC (2360); Alchemy Fuels, LLC (N/A); Carbo*Prill, LLC (8385); Chili Pepper Mines, LLC (2247); Friendsville Mine LLC (8489); Liberty Mine, LLC (3730); Red Brush West, LLC (3940); Solar Sources Mining, LLC (3628); Trust Resources, LLC (1983); Vigo Coal Land, LLC (9585); Vigo Coal Operating Co., LLC (7462); Vigo Coal Sales, LLC (1325); Vigo Cypress Mine LLC (9409); Vigo Equipment, LLC (5629); Vigo Sunna, LLC (7468); White Stallion – Eagle River, LLC (6743); White Stallion – Solar, LLC (9457); White Stallion Acquisition, LLC (2298); and White Stallion Holdings, LLC (3645).  The location of the Debtors' headquarters is:  250 N. Cross Pointe Blvd., Evansville, Indiana 47715.

advisor to, distressed companies and in assisting distressed companies with stabilizing their financial condition, analyzing their operations, and developing an appropriate business plan to accomplish the necessary restructuring of their operations and finances.  FTI has provided financial or restructuring advice, in matters unrelated to these cases, to a number of companies or their creditors in the energy and mining sectors, including Peabody Energy Corporation, Cloud Peak Energy, and Arch Coal, Inc.—three of the largest U.S. coal companies—and Armstrong Energy, American Gilsonite Company, Blackjewel, L.L.C., CS Mining, LLC, Consol Energy, Inc., Patriot Coal Corporation, Midway Gold Corporation, Magnetation, Inc., Mineral Park, Inc., and Thompson Creek Metals Company, Inc.  In addition, I have served as interim chief financial officer of 21st Century Oncology, chief restructuring officer of CS Mining, AFA Investments, and Mineral Park, and lead financial advisor or financial advisor to, among others, Peabody Energy Corporation, and Consol Energy, Inc.

3.　　In my capacity as COO I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.  I am above 18 years of age, competent to testify, and authorized to submit this declaration on behalf of the Debtors.

4.　　I submit this declaration to assist the United States Bankruptcy Court for the District of Delaware (the "Court") and parties in interest in understanding:  (a) the Debtors, their operations, and their capital structure; (b) the circumstances related to the commencement of these cases, which were filed on December 2, 2020 (the "Petition Date"), under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"); and (c) the relief requested by the Debtors pursuant to the motions and applications described herein (collectively, the "First Day Motions").

5.　　Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, information obtained from the Debtors' management team and advisors,

including the FTI team working under my supervision, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge.  If called as a witness, I would testify competently to the statements set forth in this declaration.

6.      This declaration is organized in the following five parts:

- Part I provides an overview of the Debtors' anticipated chapter 11 process, including the proposed debtor-in-possession financing, sale process, and expected case timeline.

- Part II provides background information on the Company and detailed information on the Company's prepetition operations;

- Part III provides an overview of the Company's prepetition capital structure;

- Part IV describes the significant distress presently affecting the coal-mining industry generally and its effects on the Company, certain challenges specific to the Company, and strategies the Company has implemented in response to such challenges; and

- Part V incorporates the factual bases for the relief requested in the First Day Motions.

## I.      The Chapter 11 Cases.

7.      The Debtors entered chapter 11 facing a severe, unexpected cash shortage brought on by, among other things, a steep decline in the broader coal market, which was exacerbated by the outbreak of the novel coronavirus pandemic ("COVID-19"), and outsized debt obligations that hindered the Debtors' ability to perform in an industry that typically requires substantial capital expenditures to maintain equipment and operations.  As a result of the Debtors' dire lack of liquidity, they were forced to make the very difficult decision to terminate all of their employees just prior to the Petition Date and to idle their mining operations during the pendency of these chapter 11 cases.  The Debtors intend to rehire up to 24 employees to support the Company through the chapter 11 process and to provide ongoing coal deliveries to the Debtors' largest key customer.

27416371.1

To preserve the value of the Company for the benefit of all stakeholders, the Debtors, in consultation with their advisors, engaged in negotiation with the Prepetition Term Loan Lenders (as defined below) who have agreed to provide the Debtors with essential debtor-in-possession financing to fund the Company through these chapter 11 cases and toward a sale of the Company's assets under section 363 of the Bankruptcy Code. To ensure the future viability of the Company, the Debtors seek to enter into long-term and/or short-term supply agreements with certain key customers, certain of which agreements will be completed in the very near term, following which the Debtors plan to file a motion seeking the Court's approval of the proposed sale. Due to the very limited funding available, and to preserve the going-concern value of the Company, the Debtors anticipate that these chapter 11 cases will progress quickly with the expected closing of the sale to occur during January 2021.

8.      The Debtors believe that the proposed sale transaction represents the only viable option for preserving and maximizing the value of the Company and that, if the relief requested in the First Day Motions, the proposed debtor-in-possession financing, and the anticipated sale process are not approved and consummated, or if they are delayed, the Debtors would have no choice but to liquidate under chapter 7 of the Bankruptcy Code, which would severely diminish the value of the Debtors' assets. Accordingly, the Debtors have commenced these chapter 11 cases and are pursuing the anticipated sale transaction to maximize the value of the Debtors' estates for the benefit of all stakeholders.

## II.      Company Background and Operations.

9.      The Company was founded in February 2010 for the purpose of developing and operating surface mining complexes in Indiana and Illinois and subsequently grew through a series of strategic acquisitions. Between 2016 and 2018, WSE acquired Vigo Coal Company, Alcoa's Friendsville Mine in Illinois, Solar Sources Mining, and a 51 percent majority stake in the Eagle

27416371.1

4

River Mine.  Through these acquisitions the Company grew rapidly from 2016, reaching annual sales of approximately 7 million tons of coal, including a large volume of ultra-low chlorine coal, and approximately $26 million of EBITDA during 2019.

10.     Prior to the Petition Date, the Debtors operated six high-quality, low-cost thermal surface mines in Indiana and Illinois with approximately 200 million tons of demonstrated reserves.  In addition to supplying coal to its key customer, the Debtors have other long-standing relationships with premier utility customers, which have been strengthened by the Debtors' value-added services, such as ash disposal and coal blending services.  The Debtors historically have maintained multi-year sales commitments under long-term contracts, and continue to pursue completion of long-term sales contracts that would provide substantial value to the Company.

11.     In addition, the Company's significant footprint in Indiana, where four of the six coal mines operated by the Company are located, provides access to a unique market with significant opportunities.  Indiana is a singular market with stable coal burn rates and the Debtors have a long, demonstrated, and successful track record in the Indiana coal industry.   Utility customers in Indiana are largely captive to local coal producers due to proximity of the mines to power plants, providing a significant delivered cost advantage.  Indiana coal demands continue to experience stable burn rates of more than 30 million tons per year, and the Indiana Utility Regulatory commission has estimated that coal will account for a majority of base power generation for the foreseeable future.  However, local coal production levels in Indiana have declined by approximately 20 million tons during 2020, creating an opportunity for the Company and other local coal producers to meet the consistently high level of demand.

A.      **Corporate Structure.**

12.     Debtor White Stallion Energy Holdings, LLC ("Holdings") was formed in 2017 to hold the investment in the WSE and is the direct parent of, and owns approximately 79 percent of

27416371.1

the total equity interests in, Debtor WSE.[2]  In turn, WSE is the direct or indirect parent of all of

the remaining Debtor entities, controlling (either directly or indirectly) 100 percent of the equity

interests of all of the remaining Debtors.[3]  Holdings is a majority-owned[4] direct subsidiary of

non-debtor American Patriot Energy, LLC.  A chart summarizing the Debtors' organizational

structure is attached hereto as **Exhibit A**.

      **B.**      **The Company's Assets and Operations.**

      **(i)**      **The Company's Mine Assets.**

    13.    The Company's mining operations are located in southwestern Indiana and

southeastern Illinois in the depositional and structural area commonly known as the Illinois Basin,

placing them in close proximity to key customers operating coal-fired power plants.

*[Asset Overview Graphic Follows on Next Page]*

---

[2]    The remaining approximately 21 percent of membership interests in WSE are owned by certain former key employees.

[3]    WSE also indirectly holds, through Debtor White Stallion — Eagle River, LLC, a 51 percent majority interest in non-debtor Eagle River Coal, LLC, which is an obligor under both the Prepetition Term Loan Facility and the Prepetition ABL Facility (each as defined below).  The Debtors anticipate that, after the Petition Date, Eagle River Coal, LLC will file a petition for relief under chapter 11 of the Bankruptcy Code and that the chapter 11 case of Eagle River Coal, LLC would be administratively consolidated with the Debtors' chapter 11 cases.

[4]    American Patriot Energy, LLC owns approximately 89 percent of the membership interests in Holdings, with the remaining approximately 11 percent owned by RTS Financial, LLC.



14.     The six mines that the Debtors operated prior to the Petition Date—Friendsville,

Eagle River, Antioch, Billings, Shamrock, and Charger—are held across three operating segments,

all of which are consolidated under Holdings.  These three mining segments are as follows:

- WSE operated one surface coal mine, Friendsville, representing approximately 31 percent of consolidated coal sales;

- Solar Sources Mining, LLC operated four surface coal mines, Billings, Antioch, Shamrock, and Charger, collectively representing approximately 53 percent of consolidated coal sales; and

- Eagle River Coal, LLC, a non-debtor affiliate that is majority owned by Debtor White Stallion — Eagle River, LLC,[5] operated one surface coal mine, Eagle River, representing approximately 16 percent of consolidated coal sales.

15.    The operations, as of or immediately before the Petition Date, of these six recently active mine locations are summarized in the following charts:

### FRIENDSVILLE

| Product | Thermal - Steam Coal: |
| --- | --- |
| | • 10,500 Btu |
| | • 11.20% Ash |
| | • 15.40% Moisture |
| | • 4.7 lbs SO$_2$ |
| Location | • Near Mt. Carmel, Illinois |
| Overview | • Began production in 2005 |
| | • Surface mine utilizing truck, shovel and dozer |
| | • Operates 2 shifts per day, 20 hours per day, 5 to 7 days per week, year-round |
| | • Permitted for CCP byproducts beneficial use/disposal |
| Production capacity | • 1.4 Mtpa with current equipment |
| Transportation | • Rail (NS); Truck |
| | • 6 miles from Duke's Gibson Station |
| Preparation Plant Capacity | • 300 TPH raw plant feed |
| | • 2,000 TPH Rail loadout |
| Geology | • Seams mined: Upper and Lower Friendsville |
| Workforce | • 109 |

### EAGLE RIVER

| Product | Thermal - Steam Coal: |
| --- | --- |
| | • 12,800 – 13,000 Btu |
| | • 8% Ash |
| | • 8% Moisture |
| | • 4.8 – 6.5 lbs SO$_2$ |
| Location | • Near Harrisburg, Illinois |
| Overview | • Began production in 2009 |
| | • Surface mine utilizing 29 CY shovel and 200T truck fleet, 9 D11 dozers and highwall miner |
| | • Operates 2 shifts per day, 20 hours per day, 5 to 7 days per week, year-round |
| | • Permitted for CCP byproducts beneficial use |
| | • Transitioning to Youngs Reserve and Eagle River Underground mine |
| Production capacity | • 1.4-2.0 Mtpa with current equipment |
| Transportation | • Truck; Barge to Ohio River MP 889.6 |
| | • Within 24 miles to Ohio River; within 50 miles to SIPC and other industrial customers |
| Preparation Plant Capacity | • 240 TPH raw plant feed |
| | • Barge loading facility |
| Geology | • Seam mined: Dekoven (#3) and Davis (#2) |
| Workforce | • 119 |

---

[5]    As noted above, White Stallion — Eagle River, LLC owns a 51 percent majority stake in non-debtor Eagle River Coal, LLC, which is an obligor under both the Prepetition Term Loan Facility and the Prepetition ABL Facility (each as defined below). The remaining 49 percent of membership interests in Eagle River Coal, LLC are held by Franks LLC and WARE Energy, LLC, which the Debtors understand are owned or controlled by members of the Franks family that owned and operated the Eagle River mine prior to the Debtors' majority acquisition. The Debtors anticipate that, after the Petition Date, Eagle River Coal, LLC will file a petition for relief under chapter 11 of the Bankruptcy Code and that the chapter 11 case of Eagle River Coal, LLC would be administratively consolidated with the Debtors' chapter 11 cases.

## ANTIOCH

| | |
|---|---|
| Product | • Thermal - Steam Coal:<br>  • 10,900 – 11,500 Btu<br>  • 9.5% Ash<br>  • 14.0% Moisture<br>  • 2.0 - 6.0 lbs $SO_2$ |
| Location | • Near Montgomery, Indiana |
| Overview | • Began production in 2011<br>• Surface mine utilizing truck, shovel and dozer<br>• Operates 2 shifts per day, 20 hours per day, 5 to 7 days per week, year-round<br>• Permitted for CCP byproducts beneficial use |
| Production capacity | • 1.5 Mtpa |
| Transportation | • Truck; Rail (NS & CSX)<br>• Within 50 miles to Indiana generating stations |
| Preparation Plant Capacity | • 300 TPH raw plant feed<br>• Charger Loadout (NS) 4,000 TPH<br>• Wheatland Loadout (CSX) 3,000 TPH |
| Geology | • Seams mined:  Holland, Staunton, Upper and Lower  Block, Brazil, Buffaloville, Mansfield, Danville, Hymera and Springfield |
| Workforce | • 107 |

## BILLINGS

| | |
|---|---|
| Product | • Thermal - Steam Coal:<br>  • 10,900 – 11,500 Btu<br>  • 9.5% Ash<br>  • 14.0% Moisture<br>  • 2.0 - 6.0 lbs $SO_2$ |
| Location | • Near Cannelburg, Indiana |
| Overview | • Idled in 2011; recommenced mining in 2017<br>• Surface mine utilizing truck, shovel and dozer<br>• Operates 2 shifts per day, 20 hours per day, 5 to 7 days per week, year-round<br>• Permitted for CCP byproducts beneficial use |
| Production capacity | • 1.0 Mtpa |
| Transportation | • Truck; Rail (NS & CSX)<br>• Within 50 miles to Indiana generating stations |
| Preparation Plant Capacity | • 300 TPH raw plant feed<br>• Charger Loadout (NS) 4,000 TPH<br>• Wheatland Loadout (CSX) 3,000 TPH |
| Geology | • Seams mined:  Holland, Staunton, Upper and Lower  Block, Brazil, Buffaloville, Mansfield, Danville, Hymera and Springfield |
| Workforce | • 78 |

## SHAMROCK

| | |
|---|---|
| Product | • Thermal - Steam Coal:<br>  • 10,900 – 11,500 Btu<br>  • 9.5% Ash<br>  • 14.0% Moisture<br>  • 2.0 - 6.0 lbs $SO_2$ |
| Location | • Near Ireland, Indiana |
| Overview | • Began production in 2005<br>• Surface mine utilizing truck, shovel and dozer<br>• Operates 2 shifts per day, 20 hours per day, 5-7 days a week, year-round<br>• Permitted CCP byproducts beneficial use |
| Production capacity | • 1.0 Mtpa |
| Transportation | • Truck; Rail (NS)<br>• Within 50 miles to IN generating stations |
| Preparation Plant Capacity | • 400 TPH raw plant feed<br>• Charger Loadout (NS) 2,500 TPH |
| Geology | • Seam mined: Holland, Staunton, U/L Block, Brazil, Buffaloville, Mansfield, Danville, Hymera and Springfield |
| Workforce | • 65 |

## CHARGER EAST & CHARGER WEST

| | |
|---|---|
| Product | • Thermal - Steam Coal:<br>  • 10,900 – 11,200 Btu<br>  • 10.0%Ash<br>  • 14.0% Moisture<br>  • 5.5 – 6.5 lbs $SO_2$ |
| Location | • Near Petersburg, Indiana |
| Overview | • Began production in April 2019<br>• Surface mine utilizing truck, shovel and dozer<br>• Will operate 2 shifts per day, 20 hours per day, 5-7 days a week, year-round<br>• Permitted for CCP byproducts for beneficial use (disposal permitted at Charger West Pit) |
| Production capacity | • Current 1.0 Mtpa |
| Transportation | • Truck; Rail (NS)<br>• Within 50 miles to IN generating stations (within 6 miles to IPL Petersburg Plant) |
| Preparation Plant Capacity | • 400 TPH raw plant feed (Shamrock)<br>• Charger Loadout (NS) 2,500 TPH |
| Geology | • Seam mined:  IN 5, 6, & 7 |
| Workforce | • Developing |

16.      The Company pays royalties to certain land owners for the right to perform current and/or future mining activities in the normal course of business.  Typically, the Company pays

advanced royalties to certain land owners and also accrues and pays other royalties based on the tonnage of coal sold.

### (ii)    Coal Sales and Key Customers.

17.    The Company sells coal primarily to large utility and industrial companies through long-term agreements.  The Company's largest customer, accounting for approximately 70 percent of cash receipts in the 9-month period prior to the Petition Date, is Duke Energy Indiana, LLC and its affiliates (collectively, "Duke"), which operates coal-fired power generation facilities in Indiana and across the country.

### (iii)    The Company's Employees.

18.    Prior to the Petition Date, the Company had approximately 260 employees, all of whom were full-time and none of whom were subject to collective bargaining agreements.  Due to the severe liquidity constraints facing the Company prior to the commencement of these chapter 11 cases, on December 2, 2020, the Debtors made the very difficult decision to terminate all of their employees just prior to the Petition Date, with the hopes that many of them could be rehired in the event of a successful sale of the Company's assets.  Currently, the Debtors expect to rehire up to 24 employees, consisting of a lean corporate-level staff to carry the Debtors through the anticipated chapter 11 sale process and a limited number of mine-level employees to meet certain ongoing shipping operations primarily for the benefit of the Debtors' key customer, Duke.

III.    **Prepetition Capital Structure.**

19.    As of the Petition Date, the Company's secured debt liabilities total approximately $103.9 million,[6] including:

| Facility | Maturity | Interest Rate | Approx. Principal Amount Outstanding[7] | Security |
|---|---|---|---|---|
| Prepetition Term Loan Facility | October 2021 | LIBOR plus 11.5% | $90.0 million | All Company assets |
| Prepetition ABL Facility | October 2021 | Varies[8] | $7.1 million | All Company assets |
| Real Estate Purchase Agreement | November 2024 | 5% | $2.0 million | Approximately 637 acres of real estate in Daviess County, Indiana |

A.    **Prepetition Term Loan Facility.**

20.    WSE is party to that certain Credit Agreement, dated as of April 17, 2017 (as amended, amended and restated, supplemented, or otherwise modified, refinanced, or replaced from time to time prior to the Petition Date, the "Prepetition Term Loan Facility"), among WSE, as borrower, the lenders from time to time parties thereto (the "Prepetition Term Loan Lenders"), and Riverstone Credit Management LLC, as administrative agent (in such capacity, the "Prepetition Term Loan Agent" and, together with the Prepetition Term Loan Lenders,

---

[6]    Additionally, as of the Petition Date, the Company has approximately $45 million in trade payables outstanding.

[7]    Excluding over $10 million in aggregate unpaid interest and fees.

[8]    Under the Prepetition ABL Facility (defined below), the Prepetition ABL Lender (defined below) is permitted to charge the Debtors interest at the higher of (a) a self-defined prime rate, (b) the effective federal funds rate, plus 0.5 percent, or (c) one-month LIBOR, plus 1 percent.

the "Prepetition Term Loan Secured Parties"),[9] in the original principal amount of $100 million.

Each of the Debtors other than WSE guarantees the obligations under the Prepetition Term Loan

Facility.  The initial lending under the Prepetition Term Loan Facility was $90 million, with an

additional $10 million that could have been drawn subject to certain requirements, and the original

maturity date of the Prepetition Term Loan Facility was April 15, 2022.  However, the Prepetition

Term Loan Facility was amended on October 22, 2018 to provide for a revised maximum

borrowing of $90 million and a revised maturity date of October 22, 2021.  As of the Petition Date,

there is approximately $90 million in principal amount outstanding under the Prepetition Term

Loan Facility.

21.     The Prepetition Term Loan Facility is secured by a lien on substantially all of the

Debtors' assets.  Pursuant to that certain Intercreditor Agreement, dated as of October 22, 2018

(the "Intercreditor Agreement"), by and between the Prepetition Term Loan Agent, the Prepetition

ABL Lender (as defined below), and the Debtors, the obligations under the Prepetition Term Loan

Facility are secured by (a) a first-priority lien on the Term Loan Priority Collateral (as defined in

the Intercreditor Agreement), including, but not limited to, the Debtors' equipment, real property,

coal and other mineral rights (prior to extraction), and the proceeds of the foregoing and (b) a

second-priority lien, subject to the interests of the Prepetition ABL Lender, on the Debtors' other

assets.

**B.      Prepetition ABL Facility.**

22.     The Debtors are party to that certain Credit Agreement, dated as of

October 22, 2018, (as amended, the "Prepetition ABL Facility") by and among each of the

---

[9]     Pursuant to that certain Agency Resignation, Appointment and Assumption Agreement, Reaffirmation and
Amendment to Credit Agreement, dated as of August 31, 2018, the original administrative agent under the
Prepetition Term Loan Facility, Jefferies Finance LLC, was succeeded by Riverstone Credit Management LLC.

Debtors, as borrowers, KeyBank National Association ("KeyBank"), as administrative agent, collateral agent and lender (the "Prepetition ABL Lender"). The Prepetition ABL Facility provides for an aggregate revolving commitment of up to $10 million in senior secured financing (subject to a borrowing base composed of the Debtors accounts receivable and coal inventory) with a maturity date of October 21, 2021. As of the Petition Date, there is approximately $7.1 million in principal amount outstanding under the Prepetition ABL Facility with no further availability due to the Prepetition ABL Facility's borrowing base limitations.

23.    The Prepetition ABL Facility is secured by a lien on substantially all of the Debtors' assets. Pursuant to the Intercreditor Agreement, the obligations under the Prepetition ABL Facility are secured by a first-priority lien on the ABL Priority Collateral (as defined in the Intercreditor Agreement), including, but not limited to, the Debtors' inventory, as-extracted coal and other minerals, receivables, cash, deposit accounts, intangibles, and proceeds of the foregoing, and a second-priority lien, subject to the interests of the Prepetition Term Loan Secured Parties, on the Debtors' other assets.

### C.    Intercreditor Agreement.

24.    As described above, the Intercreditor Agreement sets forth the relative priorities of the Prepetition Term Loan Secured Parties' and the Prepetition ABL Lender's liens with respect to the common collateral securing the Prepetition Term Loan Facility and the Prepetition ABL Facility, pursuant to which, the Prepetition Term Loan Secured Parties and the Prepetition ABL Lender each have (a) a senior secured position with respect to certain distinct pools of collateral (in each case, the "Senior Secured Party," and such collateral, the "Senior Collateral") and (b) a junior secured position with respect the common collateral for which the other party is the Senior Secured Party (in each case, the "Junior Secured Party," and such collateral, the "Junior Collateral"). The Intercreditor Agreement expressly limits the ability of the Junior Secured Party

27416371.1

with respect to any enforcement action against the common collateral, including in an insolvency proceeding. The Intercreditor Agreement provides that the Senior Secured Party shall have the exclusive right to take enforcement actions against its Senior Collateral, including the exclusive right to credit bid, without consultation with or the consent of the Junior Secured Party and the Junior Secured Party shall not oppose or object to the enforcement actions taken by the Senior Secured Party with respect to its Senior Collateral, including in an insolvency proceeding. Pursuant to the terms of the Intercreditor Agreement, the Junior Secured Party also is deemed to consent under section 363 of the Bankruptcy Code to the sale of any Senior Collateral that is supported by the Senior Secured Party.

### D. Real Estate Installment Purchase Agreement.

25. Debtor Solar Sources Mining, LLC ("SSM") is party to that certain Real Estate Installment Sale Agreement, dated as of November 14, 2019 (the "Real Estate Installment Purchase Agreement"), by and between SSM, as buyer, and Thomas S. Boyd ("Boyd"), as seller, pursuant to which SSM purchased approximately 637 acres of land in Daviess County, Indiana for the purchase price of $2.4 million to be paid on installment terms with an interest rate of 5 percent. Under the Real Estate Installment Purchase Agreement, SSM is obligated to make 60 monthly payments of $45,396.43 commencing on January 2, 2020. As of the Petition Date, there is approximately $2 million in principal amount outstanding under the Real Estate Installment Purchase Agreement.

### E. Reclamation Obligations (Surety Bonds).

26. The Company is subject to the federal Surface Mining Control and Reclamation Act of 1977 (the "SMCRA") and similar state statutes, which establishes mining, environmental protection, reclamation, and closure standards for all aspects of surface coal mining. Under the

SMCRA, coal mine operators must obtain a performance bond or otherwise secure the performance of all reclamation obligations associated with their coal mining activities.

27.    The Company secures the performance of its reclamation and lease obligations required under the SMCRA and similar statutes through the use of surety bonds to cover the costs that the state where the Company operates would incur if the Company were unable to fulfill its reclamation obligations.  As of the Petition Date, the Company has approximately $51.1 million in surety bonds outstanding to secure reclamation obligations. [10]

### F.    Equipment Lease Obligations.

28.    The Debtors currently lease substantially all of their mining equipment through operating and capital leases with major equipment manufacturers and other suppliers.  The interest and maturity terms of these leases vary, but they all provide the lessor with a security interest in the vehicle or equipment that is subject to the lease.  The Debtors currently owe approximately $4.8 million in the aggregate on account of past due equipment lease obligations.

### G.    Unsecured Payroll Protection Program Loan.

29.    The Debtors received an unsecured, prepetition loan of $10 million (the "PPP Loan") through the Payroll Protection Program administered by the Small Business Administration.  The Debtors believe that the majority, if not all, of their obligations in connection with the PPP Loan are eligible for forgiveness in accordance with the terms of the Payroll Protection Program, and the Debtors intend to undertake the official debt forgiveness process as provided under the Payroll Protection Program.

---

[10]    For the avoidance of doubt, the amount of outstanding surety bonds referenced herein does not take into account outstanding surety bonds maintained by non-debtor Eagle River Coal, LLC.

### H.    Equity Interests.

30.    The Company is privately held and none of its equity interests are traded on public exchanges.  The membership interests of Holdings are majority-owned by non-debtor American Patriot Energy, LLC.[11]  Holdings owns 100 percent of the voting units and approximately 79 percent of the total units of WSE, with the remaining non-voting units held by certain former key employees.  WSE owns, directly or indirectly, 100 percent of the membership interests in all of the remaining Debtors.

## IV.    Events Leading to Chapter 11.

31.    The Debtors operate in a highly competitive industry, made more competitive by the downturn in the thermal coal market and the shift to natural gas and renewable power generation.  In the months preceding the Petition Date, this situation has been exacerbated due to the decline in coal consumption at power generation facilities caused by the economic slowdown resulting from COVID-19.  This has dramatically impacted the Debtors' cash flow.  As explained more fully herein, the Debtors' liquidity is severely limited.  Thus, it is important for the Debtors to secure first-day relief that will allow them to continue to maintain idled operations while conducting an effective and efficient sale process for their assets.

### A.    The Company's Financial Distress and Prepetition Stabilization Efforts.

32.    In 2019, driven by the general downturn in the coal market, the Company, on a consolidated basis, sustained losses from operations of approximately $14.5 million and a net loss of approximately $30.1 million.  In response, the Company's management implemented cost-reduction measures in 2020, including:  (a) evaluation of mine plans related to operational

---

[11]    American Patriot Energy, LLC owns approximately 89 percent of the membership interests in Holdings, with the remaining approximately 11 percent owned by RTS Financial, LLC

efficiencies; (b) right-sizing mines and employees to match current sale needs; (c) new cost-control procedures to reduce maintenance expenses; and (d) higher utilization of the lower-cost highwall mining technique.  In addition to these measures, during 2020 the Company received equity contributions of $4.6 million from its unit holders, as well as the $10 million in proceeds under the PPP Loan Agreement.  In the period leading up to the Petition Date, the Company also investigated multiple strategic alternatives to address their liquidity shortfall, including the exploration of a potential merger aimed at achieving cost synergies and economies of scale.  Ultimately, the Company was unable to realize any such strategic alternative due to its inability to raise sufficient capital in time to consummate such a transaction.  As a result, and despite all of the efforts described above, the Company was unable to resolve their immediate cash flow issues and was forced to evaluate other potential restructuring alternatives.

**B.    Hiring Restructuring Advisors and Negotiations with Lenders.**

33.    On October 30, 2020, the Debtors retained FTI and appointed myself and Alan Boyko as interim Chief Operating Officer and interim Chief Financial Officer, respectively. Following this appointment, FTI immediately began discussions with the Prepetition Term Loan Secured Parties related to the Company's immediate need for cash liquidity and responding to diligence questions from the Prepetition Term Loan Secured Parties regarding the sizing and timing of the Company's cash needs.  In connection with these discussions, and as an initial interim step in providing the Company with the funding necessary to advance towards a consensual restructuring, the Prepetition Term Loan Lenders advanced $650,000 and $250,000, on November 23, 2020 and November 27, 2020, respectively, to the Company to cover costs related to the Company's strategic and fund-raising initiatives and ultimately its evaluation of critical restructuring alternatives.  The Company and its advisors negotiated with the Prepetition Term Loan Secured Parties with respect to the funding required for the chapter 11 cases, including the

27416371.1

terms of debtor-in-possession financing to be provided by the Prepetition Term Loan Lenders, and the scale of the Company's operations during the pendency of the chapter 11 cases. Through its negotiations with the Prepetition Term Loan Secured Parties, the Debtors ultimately determined that, to avoid a value destructive liquidation under chapter 7 of the Bankruptcy Code, the only viable path forward was to idle their mining operations and to terminate all of their employees in anticipation of a sale of the Company's assets under section 363 of the Bankruptcy Code.

**C.    Operations during the Chapter 11 Cases and the Anticipated Sale Process.**

34.    The Debtors expect that all mining operations will remain idled during the pendency the chapter 11 cases. However, the Debtors intend to rehire up to 24 employees to support the Company through the chapter 11 process and to provide ongoing coal deliveries to the Debtors' key customer. These minimal operations are essential to preserve the value of the Debtors' business and, thereby, will maximize the value of the estates for the benefit of all stakeholders.

35.    Shortly after the Petition Date, and following the Debtors' expected entry into a critical long-term supply agreement, the Debtors plan to file a motion requesting the Court's approval of a sale of substantially all of the Company's assets to the Prepetition Term Loan Lenders, subject to higher or better offers. The Debtors anticipate that the sale process will take place in an expedited manner, given the speed and efficiency required in conducting a sale process for the assets of a mostly idled coal-mining business. In accordance with the milestones governing the proposed debtor-in-possession financing, the Debtors intend to (a) file a motion seeking approval of the proposed sale no later than December 14, 2020, (b) seek entry of an order from the Court approving the sale no later than January 8, 2021, and (c) consummate the sale prior to January 15, 2021.

27416371.1

## V.    First Day Motions.

36.    To ensure a smooth transition into chapter 11 and limit the operational disruption of these chapter 11 cases, the Debtors filed several First Day Motions.  I have reviewed each of the First Day Motions filed to date, or filed substantially contemporaneously herewith, and the facts set forth in the First Day Motions are true and correct to the best of my knowledge, information, and belief, and are incorporated herein by reference.  It is my belief that the relief sought in each of the First Day Motions is tailored to meet the goals described above and, ultimately, will enhance the Debtors' ability to maximize the value of their estates for the benefit of all of the Debtors' stakeholders.

37.    The relief requested by the First Day Motions, including the requested authority to pay discrete prepetition claims or continue selected prepetition programs, is essential to preserve the value of the Debtors' estates and necessary to avoid immediate and irreparable harm to the Debtors and their stakeholders.  I believe that payment of those selected prepetition claims identified in the First Day Motions will forestall irreparable harm, thus maximizing the value of the Debtors' estates to the benefit of all stakeholders.  Further, I believe that such relief will enable the Debtors to stabilize and preserve their idled operations, thereby maximizing the going-concern value of the Debtors' business, and avoid a chaotic post-filing period that results in diminution of estate value.

38.    I understand that the Bankruptcy Rules permit the Court to grant relief within the first 21 days after the Petition Date where such relief is necessary to avoid immediate and irreparable harm.  I believe an immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations and that any delay in granting the relief requested in the First Day Motions could hinder the Debtors' ability to maintain the going-concern value of the Company and cause irreparable harm.  Furthermore, the failure to receive the requested relief

27416371.1

during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' ability to maintain even their limited operations at this important juncture.

39.    For the reasons set forth above, I believe that the relief requested in the First Day Motions is necessary to avoid immediate and irreparable harm to the Debtors and is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.  Accordingly, on behalf of the Debtors, I respectfully submit that the First Day Motions should be approved.


[*Remainder of Page Intentionally Left Blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: December 3, 2020         /s/ *David J. Beckman*
Denver, Colorado              David J. Beckman
                              White Stallion Energy, LLC
                              Chief Operating Officer

**<u>Exhibit A</u>**

**Organizational Chart**

27416371.1



27416371.1